GILBERT, HARRIS & CO. v. WATZELHAN et al.

(Circuit Court of Appeals, Second Circuit. May 13, 1912.)

No. 202.

PATENTS (§ 328*)—INVENTION—OVERLAY FOR HALF-TONE PRINTING PLATES.

The Gilbert patent, No. 565,574, for overlays for half-tone printing plates, in view of the prior art, is void for lack of invention.

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Gilbert, Harris & Co. against Joseph Watzelhan and others. Decree for defendants, and complainants appeal. Affirmed.

The following is the statement and opinion of Hand, District Judge, in the Circuit Court:

This is the usual suit in equity to enjoin the infringement of the complainant's patent No. 765,574, granted July 19, 1904, to the plaintiff's assignor, James E. Gilbert. The claims in suit are Nos. 1, which covers the process, and 4, which covers the product. The patent is for an overlay for half-tone printing plates and the method of making it. It has long been known in the printing art that clear definition and outline can be best secured in prints made from half-tone printing plates by the use of what is known as an "overlay." This overlay is placed under the page to be printed

in such a way that the heaviest pressure of the plate upon the paper occurs at the darkest portions, and that the pressure is reduced in proportion as the light is increased in the plate. Photographic half-tone plates are produced as follows: Between the object photographed and the original negative is interposed a mesh of fine wires running perpendicular to each other and at the distance usually of about 150 to an inch. The effect of this mesh is to impose upon the sensitized plate only a series of dots; each dot corresponding to one intersection of the fine wires, and each intersection being represented by one dot. Thus if there be 150 wires to the inch, in a square inch of the negative there would be 22,500 dots. The size of each dot depends upon the amount of light in the object photographed at the point covered by the dot; the dot being inversely proportionate in area to the amount of light in the object. Those portions of the object which are quite devoid of light are represented by a solid black surface, resulting from the fusion of the area of the dots. Those having the highest light are represented by very fine dots, barely visible with the naked eye.

It has been customary in the art prior to the patent in suit to differentiate the pressure of various parts of a half-tone plate. The original mode has been to make an overlay by building it up by hand. Thus a series of proofs were taken from the cut and were laid on top of each other, there being cut out successively, from the proofs before they were built together, from the first proof the exposed portion; from the second the exposed portion and the high lights; from the next the exposed portion, the high light, and the half tones; the solid tones remaining in each proof. Other devices were likewise employed to accomplish the same result, as by the use of a gelatine negative, which was used as a mold, and in other ways.

The overlay is made up into a part of the "packing" which is put between the printing surface of the iron cylinder and the paper which is to receive the impression. This "packing" consists of a certain number of paper sheets, covered by a stiff, hard draw sheet, which holds it in place. The size of the packing varies with the distance between the printing surface of the cylinder and the face of the plate, which is anywhere from .072 to .080 of an inch. Sometimes a draw sheet is put below the packing, as well as over it, and the packing itself may vary according to the personal taste of the pressman in making up his "make-ready." The overlay must register perfectly upon the plate, so that the thickest portions come in contact with the black surface, the next thickest with the half tones, the next thickest with the high lights, and the thinnest of all with the exposed places. These four degrees of tone are those generally recognized in making up the overlay.

The process of the patent in suit is to print directly upon a thin zinc plate from a half-tone plate with proof ink. While fresh, the impression is powdered with pulverized dragon's blood and the plate is then heated. Dragon's blood is a resinous gum, which in combination with the proof ink forms a protection to such portion of the plate as it covers. This combination is known as a "resist." The plate is coated upon the back with shellac to protect it, and it is then etched in a well-known etching solution of nitric acid and water. The etching is continued until the exposed portions of the plate are reduced to "film-like" thinness; the patent claiming that by that process the solid portions are unaffected and the high lights and half tones are proportionately reduced in thickness. The plate ordinarily used by the patentee is about one-hundredth of an inch in thickness, though no specification of the thickness is made in the patent, except as hereafter noted.

The defendants are agents for the patentees of a process of preparing printer's overlays and underlays, patent No. 892,166, issued June 30, 1908. This process is as follows: A sheet of paper in thickness varying from .003½ to .004½ of an inch is coated on each side with several layers of a mixture consisting of chalk and some binder made of organic materials. The total thickness of the sheet when so coated varies from .009 to .013 of an inch, and there are generally upon each side of the sheet two layers of the mixture of different colors. An impression is taken from an ordinary half-tone cut upon the front of this paper with a "resist" ink, which means an ink not

easily soluble in a solution of chloride of lime. The sheet is then removed, and three or four heavy impressions of the half-tone cut are taken upon a tympan sheet. This tympan sheet is then in the press printed upon the back of the proposed overlay, so as to produce thereon an offset with an amount of ink much heavier than the ink upon the front. The sheet so prepared is then etched in an etching bath of 2 per cent. of chloride of lime, which attacks the exposed portions of the chalk preparation and by disintegrating the binder sets free the chalk, which floats off in the bath. Wherever the resist ink on either side has been pressed upon the chalk, it prevents the action of the bath upon the binder, and so holds the chalk upon the surface. The fatty constituent of the ink sinks into the chalk preparation where it touches it, and by capillary attraction is thought to spread a certain distance down into the binding material itself. It goes so short a distance, however, that unless the layer is very thin on each side of the paper the solution would work under that part of the chalk covering which is affected by the ink and so carry it off. On this account in practical use the paper must be coated on both sides. Owing to the greater amount of ink upon the back, the relief on that side is in the high-light portions, while the relief on the front is of the half-tone portions; that is to say, the etching upon the front removes all the chalk except upon the half-tone and solid portions, while the greater protection upon the back leaves the high lights in relief. The operator is helped in ascertaining how far the process has gone by the different colors in the strata.

The defenses are noninfringement and noninvention. The chief anticipation is a German patent issued July 28, 1899, to one Albert, which describes a method for making overlays or "Zurichtungen" by the etching of metal plates. Albert took out an English patent, which was granted July 17, 1902, for the same process, which is described substantially as follows: Upon a metal plate of convenient thickness, say about one-half of a millimeter or .02 of an inch, an impression is made from the cut. The etching is done in the "usual way," but may be carried far enough to cause the thin lines corresponding to the light tones to be overetched and to "fall over." Thus, in printing, the pressure on the light tones is removed; the pressure being greater the less the surface is broken in the face of the metal relief. At that time it was well known in the art that one usual way of etching a zinc plate was by dusting it with dragon's blood, which would adhere to such portions of the plate as had already received a coat of ink. The claims in suit are as follows:

"1. The method of making overlays for half-tone printing plates, consisting in producing on a thin metallic sheet an impression of the half-tone plate with a suitable agent so applied as to present a varying resistance surface to the action of an etching agent, and proportionately reducing the surfaces of said sheet corresponding to the half-tone and high-light surfaces, and reducing to a film-like thinness the wholly exposed surface of said metallic sheet by applying a suitable etching agent to the prepared face thereof."

"4. As an article of manufacture a metallic half-tone overlay proportionately reduced in those portions corresponding to the half-tone and highlight portions of the half-tone plate, and reduced to a film-like thinness in those portions corresponding to the nonprinting surface of the half-tone plate."

### Opinion.

The first question raised is of infringement. I agree with the complainants that the defendants' process is essentially etching, and there is nothing in the file wrapper which suggests the limitation of the word to the disintegration of a metallic plate. I shall assume for argument, without deciding, that the chalk-covered paper is an equivalent for a thin metallic sheet, and likewise that the action of the resist ink upon the chalk may fairly be said to be a suitable agent so applied as to present a varying resistance surface to the action of an etching agent. The defendants also reduce proportionately

the surface of said sheet corresponding to the half-tone and high-light surfaces, and reduce to a "film-like" thinness the wholly exposed surface. In short, I shall assume that the defendants' process is within the terms of claim 1 in suit and that the product itself is within the terms of claim 4 in suit. This being true, the issue of infringement may be laid aside, and the question comes up solely of validity.

The validity of the patent depends upon differentiating it from Albert. This, indeed, was conceded when the patentee amended his claims by inserting that the metallic sheet should be "thin" and should be reduced to a "film-like thinness" in the exposed areas. Now, it nowhere appears what the patentee meant by a thin sheet. It would seem that Albert's sheet of .02 of an inch was "thin" compared with the space between the cylinder and the face of the cut, which is .072 to .080 of an inch. However, let it be assumed that a plate of "suitable gauge" is "thin" only when it is .01 of an inch thick. What difference does that make in the process? Before the examiner the patentee took the position that "cliché" meant only stereotype plates and the "Zurichtungen" included only underlays, both of which are now abundantly proven to be wholly incorrect. Arguing from this, he urged that so thick a plate, meant only for stereotypes, clearly could not properly conform to the cylinder, and, finally, that to etch so thick a plate would result in putting it out of register when it was bent over the cylinder. It was upon these representations that he got his patent, possibly because the translation in the Patent Office of the Albert patent used the word "stereotype" and "underlay" throughout, so indicating a coarser kind of work. Neither of the points then made was good in fact, and both are now substantially abandoned by the complainant.

There is no reason suggested anywhere in the proof why a sheet of .02 would not conform to the cylinder. It would have, as I have said, room enough, and Harris now only says that its thickness, if etched only to the same extent as his plate, would require an unnecessary amount of counter overlaying and make-ready. That at most was an improvement only. No suggestion is made that it would not conform to the cylinder, and the defendants' witness says that it would do so without giving any trouble. The contention has been abandoned upon this trial, and may safely be disregarded.

The next objection was that if the etching was deep the overlay, when bent upon the cylinder, would not register. This, too, was abandoned at the trial, and was a fanciful objection. Consider that the total difference between the outer and the inner side of a plate, even if it extended clear around the cylinder, was proportionate to the radius of the cylinder compared with the radius plus the thickness of the plate. Thus, the difference between either side is never more than six times the thickness of the plate. Thus, for Albert's plate, it would be about .12 of an inch, and for the complainants' .06. Now, the plate covers only a very small fraction of the cylinder, dependent upon the size of the cylinder and the size of the plate. The usual plate of 5 by 7 inches upon a cylinder a foot in diameter would at its longest dimension cover only about one-fifth of the circumference or less. That means that the total outer face of the plate would be stretched about .01 of an inch more, if it were .02 thick, than if .01 of an inch. When it is recalled that this difference is distributed over the whole face of the plate, and that under the patent in suit there is a difference of .01 of an inch anyway, it at once appears that at best the thinness of the plate was only an improvement, and a very trifling one at that, so far as registering was concerned. Now, these, barring the errors arising from mistranslation, were absolutely the only grounds for differentiating the patent from Albert which were suggested in the final letter to the examiner of May 11, 1904, which seems to have persuaded him. As I have said, both are now abandoned. The rest of the communication of May 11, 1904, was directed at the vagueness of Albert as an anticipation.

What are the present grounds of distinguishing Albert? They may be found very succinctly stated in Harris' testimony at page 65. First, he says that, if the etching were carried down to three-fourths of the plate, the etching would be so deep that some counter overlay would have to be used

to soften the effect. It is safe to say that Albert did not intend to have his process carried so far that its effects would have to be moderated afterwards. Nobody would do anything so foolish as that, and, if he did, it would not take invention to stop the process before it went too far. The next objection is that a thick base would require counter overlaying. Then, as I have already said, the elimination of the needless thickness was at most an improvement.

Finally, however, Harris suggests a very remarkable, and in my judgment a very significant, theory. Probably because he saw the difficulties into which his expert had been led by admitting what nobody had thought of denying, that is, that the dragon's blood and ink formed a homogeneous and impervious resist, he testified that the resist "comes off serially," by which he meant, I suppose, that it is slowly disintegrated by the acid, so that a varying resistance surface is obtained. Now, this is in absolute contradiction with his own expert. (See page 38.) The patent, moreover, has no suggestion of it, nor is there the least reason to suppose that, because the "proof-ink" impression must be "carefully executed," the adhering dragon's blood will come off, any more than if it is not. Moreover, the amount of ink and dragon's blood is of precisely the same thickness all over. If the acid disintegrates it, so as to allow the surface of the smallest dot to be attacked, it will likewise allow the surface of the solid areas, because they are as little protected as the dots. The varying resistance area can be procured in fact only through the exposed interstices between the dots. That is what the complainants' expert says, and what is alone possible.

Nevertheless, there is a significance in what Harris says, especially in view of what follows, which is that by uniform brushing of the plate you can get the resist off the light shades first, the half tones next, and the solid matter not at all. That is particularly significant, also, in view of the defendants' experiments, showing that the half tones, when they were not brushed, kept the same level as the solid matter, Fig. 2, so that there were, at most, only three levels. Harris admitted on cross-examination that he might probably have brushed most of the parts he wished to have in greatest relief. This, I think, is quite clearly the real secret of the patent in suit. It is not that by making the plate thin any advantage is gained over Albert. It is rather that by manipulation of the plate in the etching bath, brushing it all over, and especially where you want to increase the action of the acid, that a variety of relief is obtained in a thin plate which you could not get otherwise. Whatever relief Albert got, he got because the acid ate its way down between the protected dots and then attacked the sides of the supporting columns so made. It would certainly appear from the experiments that if the plate used by the defendants had been thicker, so that the etching could have continued until the dots in the half-tone area had been eaten through, there would have been four levels. That would have been Albert's process completely carried out, and it would have taken a thicker plate, just as he said. Perhaps the ensuing relief was too sharp, as Harris insists. If so, he had devised a good modification of the Albert patent by having the workman brush off the resist when it becomes isolated upon the tops of each of the dots, so that the brush can reach the edges. By removing the resist in those places, no doubt he accomplishes a quicker etching on a thinner plate, thus getting four levels in lower relief than if he had followed Albert's method.

But all this is wholly outside of his disclosures. He suggests nothing of the sort, obviously because the differentia would not be patentable, being only the skill of the operator. The disclosure is precisely like Albert's, and in following it one could make nothing but what Albert made. The statements in the claim about thin plates must either be interpreted as meaning thicker than what he in practice uses, or it will not work, as the defendants have shown and the complainants have not denied. Apparently he got the patent in the first place because he convinced the examiner that Albert's was a coarse underlay for stereotype plates alone. That was founded upon a misunderstanding of the meaning of the German patent, as now appears by undisputed testimony. It is true that Albert expected his reliefs to serve for underlays as well as for overlays; but they were meant as much for

one as the other, and they were certainly meant for use with all kinds of cuts. The complainants by dexterity with a brush can make them in such low relief that they need not be covered with soft paper sheets or a cloth, as Albert supposed. That is an advance; but he did not claim it, and it is probably not a patentable advance in any case. What he claimed was either Albert's, or it was a patent which would not make a proper overlay. It was Albert's half completed. To succeed he would have had to show that by stopping the process halfway he preserved a result which Albert lost, unperceived, by carrying the etching further. That might have been patentable, but it was not the fact.

Bill dismissed, with costs.

Dwight B. Cheever, Howard M. Cox, and Conrad A. Dieterich, for appellants.

Morris Hillquit (E. W. Marshall and Alexander Levene, of counsel), for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. For the reasons fully set forth in Judge Hand's opinion we think that, with the Albert patent in the prior art, the patent in suit is invalid for want of invention.

The case being determined by the conclusion of invalidity, we express no opinion upon the question of infringement.

The decree of the Circuit (now District) Court is affirmed, with costs.